UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF: | * | CASE NO. 09-10163 |
| LAWRENCE DUPUY WIEDEMANN | * | SECTION "A" |
| Debtor | * | CHAPTER 11 |

**************************************

REASONS FOR ORDER APPROVING IN PART AND
<u>DENYING IN PART THE FEES OF EMILE L.TURNER, JR.</u>

Lawrence Dupuy Wiedemann ("Wiedemann") filed a Chapter 11 Petition on January 21, 2009. This Court entered an order approving the employment of Emile L. Turner, Jr./Law Office of Emile L. Turner, Jr., L.L.C. ("Turner") on March 16, 2009. (P-53). On April 20, 2010, Turner filed his Second Application for Compensation and Reimbursement of Out of Pocket Expenses ("Second Fee Application"). He requested compensation of $69,691.25 in fees and $3,027.38 in expenses for the period between June 8, 2009 and April 19, 2010.[1] (P-225). No objections were filed to the Second Fee Application.

The Court held a hearing on the Second Fee Application on May 11, 2010. On May 19, 2010, this Court entered an Order stating that the Second Fee Application would be taken under advisement.

Debtor filed a Motion to Convert the Case from Chapter 11 to Chapter 7 on the same day Turner filed the Second Fee Application. (P-228). This Court granted the Debtor's Motion to

---

[1]Debtor's counsel filed his First Application for Compensation and Reimbursement of Out of Pocket Expenses on June 9, 2009. He requested fees of $22,725.00 and expenses of $1,031.14 for January 21, 2009 through June 8, 2009. (P-93). This Court granted the fee application on July 22, 2009, for the amounts requested.

Convert and appointed David V. Adler as Trustee on April 28, 2010. (P-231 and 232).[2] Turner filed a Motion to Withdraw as Debtor's Counsel on May 28, 2010. (P-253).

FACTS

Debtor is a seventy-nine (79) year old practicing attorney. Debtor married Rose Anderson in 1953. Three children were born of the marriage. Debtor's first wife died in 1993.

After practicing with other firms in New Orleans, Debtor formed the law firm of Wiedemann and Wiedemann, APLC, ("Law Firm") in 1989 with his three children (Fritz, Karl, and Karen Wiedemann). Debtor and his Law Firm specialize in trial practice, representing mostly injured plaintiffs.

In 1995, Debtor married Antoinette Noel ("Debtor's ex-wife" or "ex-wife"). The couple divorced in late 2006.

The Debtor and his ex-wife have been involved in ongoing litigation in state court over the ownership of the former marital domicile at 249 Citrus Road, River Ridge, Louisiana ("Citrus Property"). The case has been on a long and arduous journey to and from the state court, court of appeals, and the Louisiana Supreme Court. In other words, the state court proceeding has been a nasty, years-long, battle between Debtor and his ex-wife. The Court will not recount the particulars of this contentious marital dispute. It is enough to say that the Debtor's ex-wife disputes the ownership of the Citrus Property initially estimated to be worth $1.4 million. Debtor's ex-wife claims a fifty percent (50%) ownership interest in the Citrus Property, to which Debtor vehemently disagrees.

In addition to the Citrus Property, Debtor owns a building located at 821 Baronne Street,

---

[2] David Messina and the law firm of Gordon, Arata, McCollam, Duplantis and Eagan, were appointed as counsel for the Trustee on June 3, 2010. (P-261).

New Orleans ("Baronne Street Property") occupied by the law firm of Wiedemann and Wiedemann. He also owns an interest in a parking lot near the Baronne Street Property ("parking lot"). Finally, the Debtor owns another home located at 15 Idlewood Place in River Ridge, Louisiana ("Idlewood Property").[3] Debtor's son was living in the house when the Petition was filed.

Even before Hurricane Katrina came ashore on August 29, 2005, the Law Firm experienced a downturn in its volume of clients and available cash flow. Neither the Law Firm nor Debtor paid the outstanding mortgages on the Baronne Street Property, Citrus Property, or any other property in which the Debtor had an interest. Foreclosure proceedings instituted by Whitney National Bank, one of the Debtor's secured creditors, precipitated Debtor's bankruptcy filing. The Law Firm has not filed for bankruptcy.

Debtor's stated intention has always been to liquidate estate property in an orderly fashion. The Disclosure Statement and Plan filed in this case presented a liquidating plan. Unfortunately, for multiple reasons, the Debtor was unable to dispose of any of the real estate except for the Citrus Property. As explained below, $189,105.93 in proceeds from the sale of the Citrus Property are in the registry of the court pending resolution of the ownership dispute.

COMPENSATION REQUESTED

As noted above, Turner requests $69,691.25 in fees for the period of June 8, 2009 through April 19, 2010. The last day of the Second Fee Application coincides with the day on which Debtor filed a Motion to Convert from Chapter 11 to Chapter 7. Turner asserts the following in his Second Fee Application:

> Applicants have prepared and filed Schedules, Amended Schedules, attended the Initial Debtor Conference, and attended the Sect. 341 meeting of creditors.

---

[3] Karl Wiedemann originally owned the Idlewood Property. Debtor purchased the property in 2003 after the bank foreclosed on the son's home.

Additionally, pleadings have been filed seeking approval of four (4) Listing Agreements to allow Debtor to market the following properties:

a) 821 Baronne Street, New Orleans, Louisiana, as well as a parking lot located at the corner of Julia and O'Keefe;
b) 249 Citrus Road, River Ridge, Louisiana (contested by ex-wife);
c) #15 Idlewood, River Ridge, Louisiana

Applicants have also (a) sought to have state court counsel for Debtor engaged to handle pending appeal; (b) defended a Motion to Lift Stay filed on behalf of Debtor's ex-wife, Irene Wiedemann; (c) prepared pleadings for the sale of 249 Citrus Road; (d) prepared Disclosure Statement and Plan of Reorganization; (e) Complaint; (f) Objection to Proof of Claim; (g) Motion to Dismiss new adversary proceeding; and (h) coordinated with realtors to sell remaining properties.

**I. Basis for Approval of Attorneys' Fees**

When reviewing fees requested by counsel, the Fifth Circuit has long held that courts are to use a lodestar analysis.[4] *Johnson v. Georgia Highway Express, Inc.* sets forth twelve (12) factors to consider in awarding fees. They are:

(1) The time and labor required;
(2) The novelty and difficulty of the questions;
(3) The skill requisite to perform the legal service properly;
(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee for similar work in the community;
(6) Whether the fee is fixed or contingent;
(7) The time limitations imposed by the client or the circumstances;
(8) The amount involved and the results obtained;
(9) The experience, reputation, and ability of the attorneys;
(10) The "undesirability" of the case";
(11) The nature and length of the professional relationship with the client;
(12) Awards in similar cases.[5]

Chapter 11 work is more complex than other types of bankruptcy work, but the representation of this particular individual Debtor, whose only true assets were real estate, was not unusually

---

[4] 488 F.2d 714 (5th Cir. 1974).

[5] Id. at 718-19.

difficult.

The liquidation of real property did not present novel or difficult questions in this case. Despite the pending ownership dispute, the Bankruptcy Code provides for the sale of co-owned property free and clear of co-interests. As was done in this case, the proceeds of sale are typically escrowed pending resolution of ownership interests.

While this case was extremely litigious, the issues presented were typical of those found in most real estate Chapter 11 proceedings. In this case, the majority of the disputes, were between Debtor and his ex-wife. Given the finite amount of assets and the Debtor's advanced age, continuing to fight over the ownership of the Citrus Property only increased the amount of attorneys fees without inuring a benefit to creditors.

Turner did not allege that this case precluded other employment, and in fact Turner is representing at least two other debtors in this Court simultaneously with Debtor. Turner has not alleged that the time constraints of the case were problematic or atypical of other Chapter 11 cases of like size. The case has been pending for 21 months, longer than reasonable given its size and composition. Turner's hourly rate was preapproved by the Court on his application for employment and is one customarily charged by bankruptcy counsel of his stature and experience. The fee is fixed and the case has not been characterized as undesirable. The nature of the relationship with Debtor is not relevant.

The factors of concern are the time and labor actually required to maximize the estate's assets, the amounts involved, and the results obtained.

### A. Time and Labor Required, The Skill of the Lawyer Involved and The Experience of Counsel

Compensation of a Chapter 11 debtor's counsel is governed by section 330 of the Bankruptcy Code. For purposes of this ruling, the most important part of section 330 is "(c) whether the services

were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." As explained below, this Court finds that some of Turner's time did not result in "identifiable, tangible and material benefit to the bankruptcy estate."[6]

### 1. Continuing Litigation with Ex-Wife

It is axiomatic, especially in bankruptcy cases, that the chances of success in litigation must outweigh the costs of pursuing the action. This Court finds that at the time the services were rendered, as well as in hindsight, the costs of continuing the litigation between the Debtor and his ex-wife outweighed the chances of success. More importantly, the cost of continuing the action were substantially outweighed by any chance of an identifiable, tangible, and material benefit to the bankruptcy estate.[7]

Debtor originally scheduled the Citrus Property for $1.4 million. On November 17, 2009, however, Debtor requested permission to sell the Citrus Property for $1,000,000.00. The Court granted the motion on December 17, 2009. After payment of closing costs, realtor's commission, the second ranked mortgage, and the undisputed portion of the first mortgage, some funds remained. Per the parties' request, $189,105.93 was put in the registry of the court pending resolution of the disputes between Debtor and his ex-wife.[8] As of November 17, 2009, the extent of the monetary dispute between the Debtor and his ex-wife was fixed, and effectively was reduced, to the monetary amount of $94,552.96, or one-half of the funds on deposit. The estate had already incurred $112,469.93 in pre-petition fees secured by the property and approximately $23,000.00 in post-

---

[6] In re Pro-Snax Distrib., Inc., 157 F.3d 414 (5th Cir. 1998).

[7] In re Spillman Dev. Group, Ltd., 376 B.R. 543, 550 (Bankr. W.D. Tex. 2007)

[8] $176,834.05 represents the amount remaining after payment of the above-mentioned costs and mortgages; $12,271.88 represents the disputed amount of forced placed insurance by the first mortgage holder.

petition administrative fee costs.

Despite this fact, Debtor's counsel continued to incur fees associated with the fight over ownership of the Citrus Property. In fact, Debtor's counsel incurred roughly $4,800.00 in fees after November 17, 2009, related to the dispute in ownership of the Citrus Property. This was in addition to the fees charged by special counsel, Jack Dveirin, on the same issue.[9]

Even if the Court assumes that the fees incurred in the state court proceeding were beneficial to the estate before the sale motion was filed, it has trouble finding any material benefit from the continued fight after the Sale Motion. The Court bases this decision on the fact that value of the Citrus Property became fixed when the offer to purchase was made and the Motion to Sell was filed. In other words, it became abundantly clear that it was unlikely that creditors would receive full payment on their claims whether or not the Debtor was successful in the state court proceedings. The continued fight over the ownership rights in the Citrus Property only led to an increase of legal fees to be paid as administrative claims.

This Court finds that the legal fees incurred by Turner after November 17, 2009, with regard to the state court proceedings with Debtor's ex-wife were not beneficial to the estate and were duplicative of the work performed by Dveirin. As a result, fees in the amount of $4,800.00 are hereby disallowed.

    2. 15 Idlewood Place, River Ridge, Louisiana

---

[9] Jack Dveirin filed a fee application for $49,134.00 for fees incurred between April 8, 2009 and April 24, 2010. Dveirin incurred approximately $26,000 in legal fees relative to the state court action after November 18, 2009 (the date on which the Motion to Sell the Citrus Property was filed). Dveirin also has a pre-petition claim for $112,469.93 against the estate for legal fees on the same matter. The Motion to Compromise between the Debtor's estate, Dveirin, the Debtor's ex-wife and Whitney National Bank fixes Dveirin's claim in the amount of "$112,500 reduced on a dollar-for-dollar basis by any distribution received by Dveirin from the Registry Funds only. The balance of the Dveirin Allowed Claim, after the dollar-for-dollar reductions for distributions received by Dveirin from the Registry Funds, will be an allowed general, unsecured deficiency claim against the Estate." The Compromise Motion also states that the ex-wife and the Trustee "agree to withdraw their objections to the fee application filed by Dveirin and will request that the fees and expenses be approved in the full amount set forth in the application..." In total, Dveirin seeks payment of $161,634.00 in legal fees for the state court action.

During the December 17, 2009 hearing on the sale of the Citrus Property, the Court learned for the first time that Debtor's son continued to live in the Idlewood Property post-petition rent free with the full knowledge of Debtor's counsel. At that point, this Court ordered Debtor to file an "adversary proceeding against the occupants of #15 Idlewood Place, River Ridge, Louisiana, for possession of the premises under Louisiana State Law and a money award for a reasonable rent and damages incurred with their use and occupancy from the date of filing of this bankruptcy case, until vacated."

Debtor's son testified at the January 12, 2010 hearing on his Motion to Reconsider the eviction order, that his family occupied the house "pursuant to an agreement with my father and had been doing so for a period of in excess of three years." He admitted that "we continued to pay that mortgage...until such time as it became evident that my father was going to have to file for Chapter 13–...We stopped paying the mortgage – I would have to – to be exact I would have to look at the records, but approximately six months before the filing."[10]

In other words, Debtor's son paid the mortgage on the Idlewood Property until he realized that his father needed to file bankruptcy. Pre-petition the agreement apparently was that Debtor's son and his family could live in the Idlewood Property in exchange for payment of the mortgage. Unfortunately, Debtor's son choose not to pay the rent or the mortgage note post-petition, leaving the estate to fall farther behind on the mortgage notes. The nonpayment of the mortgage also led to the unnecessary incurrence of more fees and interest on the secured loan.

Pursuant to the Court's December 17, 2009 Order, Debtor filed a Complaint to Terminate Oral Lease; Notice to Vacate; Monetary Claims for Rent and/or Damages against the Debtor's son on

---

[10] This testimony coincides with BAC's assertion in its Objection to Debtor's Plan that BAC had not received any payment since July 2009.

December 30, 2009.[11]  On February 23, 2010, the Debtor filed a Motion to Intervene for the Purpose of Asserting an *In Personam* Opposition to the Court Ordered Complaint of the Estate to Collect the Erroneously Alleged Indebtedness of Karl Wiedemann and Stefanie Wiedemann Relating to Their Occupancy of 15 Idlewood Place.

Debtor, who filed the Motion to Intervene in personam, attempted to assert his personal opposition to the Court-ordered complaint. The Debtor alleged that the suit was to "collect a non-existent debt of Karl Wiedemann and Stefanie Wiedemann." He noted that there was "no indebtedness to Lawrence D. Wiedemann whatsoever for their occupancy of #15 Idlewood Place. The creditors of Lawrence D. Wiedemann, in general, and the Whitney National Bank, in particular, have been the beneficiaries of the unrestrained generosity of his children in using their personal assets to pay down his liability to creditors in an effort to keep him out of bankruptcy and should not be visited with the insult of paying a debt that they do not owe in addition thereto." This Court denied the Motion to Intervene on February 24, 2010. (P-13).

In direct contravention to the interests of the estate Turner was retained to represent, Turner's Second Fee Application includes entries for time expended in advising the Debtor to contest the estate's claim for rent. For example, the Second Fee Application contains the following entry for February 19, 2010: "Received pleading from client re case against Karl and Stephanie; reviewed; spoke to Larry and convinced him to file a Motion to Intervene; discussed ramifications of his actions."

Debtor's son also raised the following substantive defenses to the Complaint: "(i) at all times pertinent, Defendants occupied the Idlewood Property pursuant to an oral agreement in which the Debtor agreed to waive any and all rents in exchange for and in consideration of Karl Wiedemann's

---

[11] Adversary proceeding number 09-1185.

continued full time employment with the Debtor's law firm, at a greatly reduced compensation, and (ii) Karl Wiedemann made monetary loans to Debtor in excess of $200,000.00 from a life insurance policy he owned, which funds were used to reduce the Debtor's personal indebtedness to Whitney National Bank."[12] As noted by the Court, any debt owed to Debtor's son was owed by the Law Firm, not the Debtor's estate. It is also noteworthy that neither Karl nor Stefanie Wiedemann filed a proof of claim in this matter for amounts allegedly owed to them by the Debtor, nor did the Schedules list Karl or Stefanie Wiedemann as creditors. Finally, their actions of paying the mortgage on the home and the admissions in open court belie any agreement that the son would live in the house rent free.

According to Schedule J, the mortgage note to Countrywide Mortgage Company/BAC on the Idlewood Property was $3,616.98 per month. As such, the mortgage note to be paid on the Idlewood Property was $43,403.76 per year.

By this Court's calculation, Debtor's son should have paid $43,403.76 from January 21, 2009 through his eviction on January 31, 2010. Debtor's son also testified that he stopped paying the mortgage note six months before the bankruptcy petition was filed. As such, the total amount not paid by Debtor's son for occupancy of the house was $65,104.44.

On September 28, 2010, this Court granted the Motion to Compromise the claim against the Debtor's son. (P-301). The parties entered into a Consent Agreement in favor of the Estate and against Debtor's son for $30,000.00. The settlement amount is secured by various interests of the Debtor's son. The Court does not know the amount of fees to be charged to the estate by Trustee for bringing this matter to a conclusion, but it does know that these fees would have been unnecessary if Debtor's counsel had instructed Debtor's son to pay for his occupancy or asked the Court to evict

---

[12] A Scheduling Order was entered on March 30, 2010, setting the trial date for July 18, 2010. The trial was continued to August. The Motion to Compromise was filed on August 31, 2010.

Debtor's son for non-payment.

In addition to the decrease in the value of the Debtor's estate brought on by the non-payment of mortgage notes or fees, the realtor hired to sell the property also testified that Debtor's son had abused the property during his occupancy and that over $11,000.00 in repairs were necessary just to place the property on the market. The Court simply notes at this juncture that the Trustee is still attempting to sell the house.

A review of Turner's fee application shows that he incurred fees of roughly $8,000.00 with regard to the Idlewood property. This Court finds, however, that roughly $3,200.00 in fees were incurred discussing the Idlewood property with Debtor, filing the Complaint against the Debtor's son, reviewing the Motion for Reconsideration of the order regarding eviction of the Debtor's son, participating in status conferences and generally reviewing pleadings filed in this matter in preparation for trial.

The Court finds that the fees charged by Debtor's counsel for work pertaining to the Idlewood Property did not materially benefit the estate. In fact, the Court finds that the lack of candor regarding the occupancy of the Idlewood Property rises to the level of a serious breach of a fiduciary obligation[13]. *In re: JLM,* 210 B.R. 19 (2nd Cir. 1997).

The Court also finds that the Complaint against Debtor's son would have been unnecessary if Debtor's counsel had demanded that Debtor's son pay for his occupancy of the home or move out. To allow Debtor's son to remain in the property, without paying for the occupancy, deprived the estate of much needed assets. As such, the Court will disallow $3,200.00 in fees to Turner. The Court also disallows an additional $13,403.76 from Turner's fee for his lack of candor to the Court

---

[13]Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.), 210 B.R. 19 (B.A.P. 2d Cir. Conn. 1997).

and the breach of his fiduciary obligation to the estate to maximize the estate's assets.[14]

This $13,403.76 represents the difference between what Debtor's son should have paid in rent or mortgage payments during the one year he occupied the house without the Court's knowledge and the amount Debtor's son will pay to the estate pursuant to the Compromise.

## **CONCLUSION**

Based on the above findings, the Court awards Emile Turner, Jr./Law Office of Emile Turner, Jr. the sum of $48,287.49 in fees and $3,027.38 in costs. The Court will enter an Order in accordance with its ruling. The remainder of the fees are disallowed.

---

[14] Jackson v. Levy, 2000 WL 124822 (S.D.N.Y. Feb. 2, 2000) (a debtor in possession's fiduciary obligation to its creditors includes refraining from acting in a manner that could damage the estate or waste its assets); *see also* In re Melenyzer, 140 B.R. 143, 154 (Bankr. W.D. Tex. 1992).